FILED

## United States District Court
## Northern District of Alabama
### Southern Division

00 JUL 28 PM 3: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **Janice Amos,** | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-99-N-0612-S |
| | ] | |
| **Blount County Health Care, Inc., et al.** | ] | |
| | ] | |
| | ] | |
| Defendant(s). | ] | |

**Memorandum of Opinion**

ENTERED

JUL 28 2000

### I.    Introduction.

In this employment discrimination case, the plaintiff, Janice Amos, brings claims

pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623, against defendant

Blount County Health Care, Inc. (Health Care),[1] alleging discrimination on the basis of age

and against defendant DHS of Blount County, L.L.C. (DHS),[2] alleging that DHS retaliated

against her because she exercised rights afforded her under ADEA. The matter is presently

before the court on the defendants' motions for summary judgment (Doc. Nos. 70 and 74),

filed May 11, 2000. The motions have been fully briefed and are ripe for decision. Upon due

consideration, both motions will be granted in all respects.

---

[1] Originally, this action also was brought against Thomas Hackney, administrator of Blount County Health Care, but he was dismissed from the lawsuit on January 27, 2000. *See order* (Doc. No. 63).

[2] DHS assumed the management of Health Care on November 1, 1998.



## II.    Statement of Facts.[3]

Health Care owned and operated the long-term care/skilled nursing facility, d/b/a TLC Nursing Center, in Oneonta, Alabama, until October 31, 1998, during which time Thomas Hackney, who is older than the plaintiff, was the administrator. On November 1, 1998, Health Care and DHS entered into a lease agreement under which DHS leased and operated the facility. Angela Allums became the new administrator.

### A.    Facts Surrounding ADEA Claim.

Health Care hired the plaintiff in November of 1995, when she was 39 years old as a part-time worker in the housekeeping department. While employed by Health Care, Ms. Amos received two promotions and three raises when she was over the age of 40. Specifically, the plaintiff was promoted and received an increase in pay in February of 1997, when she moved from the housekeeping department and became a certified nursing assistant (CNA). The plaintiff was promoted again when she was made a CNA in the restorative nursing department. It is undisputed that during the first year of her employment with Health Care, the plaintiff read the defendant's policy against discrimination on the bulletin board and was thus aware of that policy. Plaintiff's evidence (Doc. No. 91) tab 6 at 96.

The plaintiff alleges that she was denied promotion to the position of social services director on five occasions between January 1997 and September 1998 because of her age.

---

[3] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

It is undisputed that one of the responsibilities of the director was to accompany a nurse to hospitals to evaluate potential residents for admission and to conduct an examination of the resident's medical condition.

In December of 1996, the social director position came vacant and Beverly Townes, a 37-year-old CNA, applied for the position and was recommended by Stephanie Graham, Health Care's director of nursing. Ms. Graham did not recommend the plaintiff, who was not a CNA at that time, for the position. Mr. Hackney promoted Ms. Townes to the director position in January of 1997. The plaintiff was then 40 years of age. Ms. Amos asserts that she was not promoted because she was the older applicant. She bases this belief solely on the fact that she was older than Ms. Townes and on a conversation she had with Mr. Hackney after the promotion. The plaintiff brought up the fact that "she was one of the older ones" that applied and Mr. Hackney told her "let's not make this an age issue." Plaintiff's evidence (Doc. No. 91) tab 6 at 82-84. The plaintiff also testified that Mr. Hackney asked her how old she was when she brought up the age issue. Health Care's evidence (Doc. No. 79) at 185. As noted, it is undisputed that the plaintiff was then aware of the defendant's policy and federal law prohibiting age discrimination but chose not to file an EEOC charge at that time.

In January of 1998, Ms. Townes felt like she could not handle the director position and asked to be transferred to the activities department where she had cross-trained. Mr. Hackney transferred her and considered revising the qualifications for the director position to include a nursing degree because having a CNA in the position had not worked well. He believed that changes to the Medicare reimbursement rules that had gone into effect in 1998, made the position more technical and specialized. The changes included reimbursing

3

facilities at a fixed rate per resident which was to be determined at the initial assessment of the resident's medical condition at the time of admission to the facility. Because of the new Medicare reimbursement policies, it became important that a proper assessment of a potential resident's medical condition be made at the outset. Mr. Hackney therefore believed that a nurse (RN) or licensed practical nurse (LPN) would be better qualified than a CNA or social worker to evaluate the medical condition of potential residents since the director's responsibilities included assessing potential residents for admission to the facility. This requirement would also eliminate the need to send two people, the director and a nurse, to assess a potential resident, although the director of nursing and another nurse would continue to evaluate the patient after the patient was admitted. Mr. Hackney did not post these qualifications of an RN or LPN for the director position.

While Ms. Townes had been the director, Denise McDaniel had assisted her on a part-time basis. When Ms. Townes left the director position, Mr. Hackney caused Ms. McDaniel to increase her hours in the social services department since she was already familiar with the department's operation. She was also recommended by Ms. Townes and the director of nursing. Ms. McDaniel performed charting and filing in the department while Mr. Hackney reconsidered the qualifications he wanted in the next director. Although Ms. McDaniel received a raise in February of 1998, it was a belated raise that she was supposed to have received in August of 1997, when she obtained her CNA license. Mr. Hackney does not recall whether Ms. McDaniel was actually named acting social services director at that time. Ms. McDaniel continued to work in the department until April of 1998, when she was transferred to the business office. The plaintiff asked Andy Matthews, Health Care's

4

comptroller, if he could convince her that age had nothing to do with placing Ms. McDaniel in the social services department and he said no, that he could not convince her. The plaintiff did not file an EEOC charge within 180 days of learning that Ms. McDaniel was working in the social services department.

During the spring of 1998, Mr. Hackney decided to require that the director be at least a Licensed Practical Nurse. In the interim, Mr. Hackney transferred Amy Brewer, a part-time employee and college student, to the social services department from the business office to perform charting and filing duties until he could find someone for the director position. Mr. Hackney testified that he knew Ms. Brewer would be leaving in the fall when she went back to college. Plaintiff's evidence (Doc. No. 91) tab 7 at 120-21. Ms. Brewer did not receive a raise upon transferring to the social services department.

Mr. Hackney interviewed Jane Irvin, a 48 year-old RN, in April of 1998, and she began work as the director in June of 1998. Ms. Irvin was recommended by Dr. Leonard Gibson, Health Care's physician, as he had previously worked with her. Ms. Irvin was the director for only two-and-one-half months before leaving her job in August 1998 due to an illness. The plaintiff does not contend that Mr. Hackney discriminated against her when he hired Ms. Irvin since she is older, but she believes that Mr. Hackney hired Ms. Irvin to cover up his discriminatory animus toward older people.

Mr. Hackney renewed his search for an LPN or RN to fill the director position. The plaintiff, and Byron Tidwell, another CNA who was younger than 40, applied for the position. Mr. Hackney hired Tracie Long, an LPN to fill the position on August 27, 1998. Ms. Long had worked at Health Care as a CNA while she was going to school to become an LPN. She

5

took the position, but only worked a week before deciding that she wanted to be an LPN and not the social services director. Ms. Townes was temporarily put in the department for two days until a new director could be found.

Mr. Hackney hired Sharon Hampton, another LPN, to fill the position on September 13, 1998. Ms. Hampton stayed in the position for the remaining time Health Care operated the facility. On September 17, 1998, the plaintiff, with the assistance of counsel, filed an EEOC charge, alleging that Health Care had discriminated against her on the basis of her age under Title VII.  On September 18, 1998, Ms. Amos had a conversation with Mr. Hackney during which he explained to her why the last three people he had selected for the position were LPN's. On November 13, 1998, while the plaintiff was on a leave of absence and after DHS began leasing and operating the facility, the plaintiff amended her charge alleging that Health Care had discriminated against her on the basis of age under the ADEA. The plaintiff filed this action on March 18, 1999.

### B.    Facts Surrounding Retaliation Claim.

At the time that DHS began to lease the facility from Health Care on November 1, 1998, the plaintiff was on medical leave of absence after surgery. All the employees of Health Care, including Ms. Amos, became employees of DHS as of that date. On December 2, 1998, Ms. Allums became the administrator. The plaintiff returned from her leave of absence on December 28, 1998. In January of 1999, Vicki Morris, who had previously been an RN supervisor and had supervised the plaintiff for approximately a year while the facility was operated by Health Care, became the director of nursing for DHS. It is undisputed that when Ms. Morris was still an RN supervisor and Health Care was still running the facility,

6

she told the plaintiff that "she didn't blame [her] for filing the EEOC charge." DHS' statement of facts (Doc. No. 71) ¶ 27.

The plaintiff alleges that on January 21, 1999, Ms. Morris observed the plaintiff and Janet Duke in the office doing paperwork and Ms. Morris told them that they needed to be in the halls because people were complaining that they were not doing their jobs. The plaintiff felt as if the comment was directed at her because that day was Ms. Duke's last day of work. It is undisputed that Ms. Morris told a number of other CNAs on other occasions to leave the office and that she did not want them congregating there. The plaintiff was not disciplined for the incident. The plaintiff testified that she felt at that time that Ms. Morris wanted her to quit "on account of the lawsuit." DHS' evidence (Doc. No. 73) tab 1 at 293-94.

On January 26, 1999, the plaintiff and Ms. Mardis, plaintiff's sister-in-law, asked Ms. Morris if they could leave early. Ms. Morris told them one of them was needed for supper duties and the other could leave, and that they could decide who was going to stay and who was going to leave. The plaintiff and Ms. Mardis decided that Ms. Mardis would leave early. On Sunday, January 28, 1999, the plaintiff sought permission to come into work late. Ms. Morris refused the request, her given reason being that she could not favor one employee over another. However, the plaintiff alleges that Ms. Morris allowed Ms. Mardis to leave early on January 26. The defendant asserts that on the weekends the staffing level at the facility was cut to half of what it was during the week. The plaintiff does not know of an occasion when Ms. Morris allowed an individual to come into work late on a Sunday. The plaintiff asserts that after she complained about being singled out, Ms. Morris approved her leave requests.

7

Apparently around this same time, the plaintiff asked Ms. Morris why other CNAs made more money than did she even though she had more seniority. Ms. Morris never responded to the plaintiff because the evaluations and raises had taken place prior to DHS taking over, and the individuals who performed those evaluations and gave the raises were no longer working at the facility. Ms. Morris testified that she had not done any evaluations or given any raises for any employees. It is undisputed that Janet Duke, another restorative CNA, made less per hour than did the plaintiff while employed by DHS and that she resigned in January of 1999.

Also during this time period, Ms. Morris observed Ms. Amos during her breaks and suggested to the plaintiff's supervisor, Brenda Cleveland, that the plaintiff's breaks were both too frequent and too long. The plaintiff was not disciplined.

On February 10, 1999, the plaintiff presented a memo from her physician stating that she should not work more than 10 hours a day due to hypothyroidism and hypertension. Ms. Cleveland and Ms. Morris told the plaintiff that Ms. Allums would not allow her to work ten hours a day. Ms. Morris would not allow her to work 10-hour days because the restorative department was one person short and did not have anyone to cover the other two hours of the 12-hour shift. Ms. Allums asserts that she would not allow the plaintiff to work a 10-hour shift because of limited staff, overtime, and morale issues and that she would have to find someone to cover the extra two hours of the regular 12-hour shift. Ms. Allums told the plaintiff that she could not create a shift for her because she would have to do the same for others. Ms. Allums did offer to allow the plaintiff to transfer from the restorative department to another hall where she would have been able to work an 8-hour shift. Ms. Allums also

8

offered to allow the plaintiff a day off between every workday or every two days in the restorative department. The plaintiff decided to continue to work in restorative until August 23, 1999, when she put in a notice to move to an 8-hour shift on another hall. Judy Able, a restorative CNA, worked 4 to 5 hours a day due to a worker's compensation injury she had received prior to becoming a restorative CNA. Ms. Able began this modified schedule before Ms. Morris became the director of nursing and before DHS became the manager of the facility. Sherry Fambrough, who was the director of nursing before Ms. Morris, had allowed the plaintiff to work eight to ten hours a day when she returned to work from medical leave in December of 1998. Ms. Allums told the plaintiff that Ms. Fambrough should not have allowed such a modification without discussing it with her.

Sometime at the end of February or beginning of March of 1999, the plaintiff talked to Ms. Morris about some concerns dealing with her job and alleges that Ms. Morris picked up a paper and began reading aloud and would not respond to the plaintiff. The plaintiff started crying and left Ms. Morris' office.

The plaintiff also asserts that she did not have the respect of some of her co-workers after she returned from leave because they were afraid to associate with her. She did not discuss this situation with any of her co-workers. The plaintiff also felt that Ms. Morris and Ms. Mardis were talking about her. On March 17, 1999, the plaintiff's husband called her at work but was told by Denise McDaniel that the plaintiff could not come to the phone because she was busy, even though the plaintiff was on her lunch break and could have come to the phone. The plaintiff's husband came to the facility to talk to her since he could not reach her by phone. On March 19, 1999, the plaintiff's son called because he was sick,

9

and Ms. McDaniel told him the plaintiff could not take the call. Ms. McDaniel put the message on the bulletin board and the plaintiff did not see it until the next day. Ms. McDaniel told her that she was told that "we weren't to get phone messages," and "to put them on the board." DHS' evidence (Doc. No. 73) tab 1 at 434. The plaintiff stated that it depended on the person who took the call and their mood as to whether messages were posted, brought to you, or whether you got to take the call. The plaintiff never complained about these two instances.

On June 21, 1999, the plaintiff submitted a written request to be transferred from the restorative department to a hall beginning August 23, 1999, but the plaintiff never spoke to Ms. Allums about her request. On June 28, 1999, the plaintiff began having chest pains at work, and was granted a leave of absence. The plaintiff was released to work as of August 2, 1999, but on August 1, 1999, she decided to quit work due to stress and prepared a resignation letter which she submitted to Ms. Morris on August 2, 1999. When the plaintiff came to work on that day, she was informed that she had been transferred to a hall on which she had previously worked. The plaintiff was scheduled to work on August 7, 1999, and August 8, 1999, even though she had indicated in her resignation letter that she would be unable to work those days. The defendant asserts that it had a policy requiring employees to make up any scheduled weekend hours that they missed if the leave was not under the Family and Medical Leave Act or worker's compensation laws. The plaintiff asserts that she understood the rule to be that if you had a doctor's excuse you did not have to make up the weekend. Regardless, the plaintiff called in and did not work on August 7th

10

or 8th, and was not disciplined for those absences. The plaintiff's last day of work with DHS was August 13, 1999.

Although the plaintiff filed her lawsuit for age discrimination against Health Care on March 15, 1999, she did not file an EEOC charge alleging retaliation against the facility, TLC, formerly known as Health Care, until August 12, 1999. The plaintiff alleges in this charge that Ms. Morris knew that Mr. Hackney had turned her down for the director position and that she was very supportive of her when she filed her EEOC charge of age discrimination.

## III.    Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Where the nonmoving party will bear the burden of proof at trial, there is no requirement, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323. "Instead, the moving party simply may '"show[ ]"'--that is, point[ ] out to the district court--that there is an

11

absence of evidence to support the nonmoving party's case.'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir.1991) (*en banc*) (quoting *Celotex*, 477 U.S. at 324); *see also Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (same); *Young v. City of Augusta*, 59 F.3d 1160, 1170 (11th Cir. 1995). However, "it is never enough simply to state that the non-moving party can not meet its burden at trial." *Clark v. Coats and Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party must instead make an "affirmative showing" that crucial evidence is missing "by reference to any combination of the following: pleadings; deposition testimony of a party or its witnesses; affidavits; responses to interrogatories . . . ; requests for admission . . . ; and any other exchanges between the parties that are in the record." *Cheatwood v. Roanoke Industries*, 891 F. Supp. 1528, 1533 (N.D. Ala. 1995) (Hancock, J.).

"Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Four Parcels of Real Property*, 941 F.2d at 1437-38 (11th Cir.1991).

At this stage, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on

12

her pleadings. *Id.* at 324. The nonmoving party must make a specific, affirmative showing that a genuine factual dispute exists. If the required showing is not made, "summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

After the plaintiff has responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the

13

evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**IV.    Discussion.**

### A.    Failure to Promote Based on Age Discrimination.

#### 1.    Townes and McDaniel.

The defendant asserts that the plaintiff's claims of discrimination with respect to Ms. Townes and Ms. McDaniel are barred by the applicable statute of limitations by reason of her failure to file a timely EEOC charge. The ADEA requires that a charge of discrimination be filed with the EEOC within 180 days of the alleged unlawful practice. 29 U.S.C. § 626(d). It is undisputed in this case that the plaintiff did not file her EEOC charge until September 18, 1998, clearly outside the 180-day period with respect to both Towns and McDaniel. Thus, the defendant argues that Ms. Amos's claims regarding Mr. Hackney's decisions as

14

to both Townes in January of 1997, and McDaniel in January of 1998, are time-barred. The court agrees and rejects the plaintiff's continuing violation argument.[4]

It is evident that the plaintiff was aware of her rights and that she believed Mr. Hackney's actions with regard to Ms. Townes and Ms. McDaniel to be discriminatory towards her at the time they occurred. It is undisputed that during the first year of her employment with Health Care, the plaintiff read the defendant's policy against discrimination on the bulletin board. Plaintiff's evidence (Doc. No. 91) tab 6 at 96.

With regard to Ms. Townes, the plaintiff stated that after she did not get the job, she "believed at that time that my age had something to do with me not getting the job," and that she was aware that she might have been discriminated against based on her age when Ms. Townes received the job. Health Care's evidence (Doc. No. 79) Amos deposition at 94. She also testified that she was aware that Ms. Townes would occupy the job with some degree of permanence, but she did not file an EEOC charge because "[i]t was a one-time thing. It was just one time. It was my word against his. I could live with it at that time." *Id.* Therefore, the plaintiff did not file an EEOC charge despite the fact that she knew about the policy prohibiting age discrimination at the time Ms. Townes received the director position. *Id.* at 96. The plaintiff also discussed the age issue with Mr. Hackney and stated to him that "she was one of the older ones" who had applied. Mr. Hackney apparently told her "let's not make this an age issue." Plaintiff's evidence (Doc. No. 91) tab 6 at 82-84. The plaintiff

---

[4] The plaintiff herself points out that one of the factors to consider in deciding whether a continuing violation exists is the degree of permanence which would alert the employee to assert her rights. The plaintiff testified that she was aware that Ms. Townes would occupy the job with some degree of permanence. Health Care's evidence (Doc. No. 79) Amos deposition at 94. Interestingly, the plaintiff omits a discussion of the permanence factor in her brief. Plaintiff's responsive submission (Doc. No. 93) at 21-22.

15

also testified that Mr. Hackney asked her how old she was when she brought up the age issue. Health Care's evidence (Doc. No. 79) Amos deposition at 185. Clearly, the plaintiff was aware of her rights but failed to file an EEOC charge.

With regard to Ms. McDaniel, the plaintiff testified that she thought that age had even "more so" to do with Mr. Hackney's decision to put Ms. McDaniel in the social services department. *Id.* at 114. The plaintiff testified that her answers would be the same regarding what she did and did not do and whether she knew about the policy as the answers she gave regarding the promotion of Ms. Townes. The plaintiff also testified that she asked Mr. Matthews, the comptroller, if he could convince her that age had nothing to do with placing Ms. McDaniel in the social services department and he told her no that he could not convince her. The plaintiff stated that she did not know why she did not file an EEOC charge within 180 days of the date when Ms. McDaniel moved into the social services department.

Based on the evidence, the court finds that the plaintiff's claims with respect to Ms. Townes and Ms. McDaniel are clearly time-barred. Accordingly, the defendant's motion for summary judgment as to these claims will granted.

## B.   Brewer, Long, and Hampton.

In order to establish a *prima facie* case of failure to promote, the plaintiff must produce evidence to show that (1) she is a member of a protected group; (2) was qualified for and applied for the promotion; (3) was rejected despite her qualifications; and (4) the individual who received the promotion was equally or less qualified for the position and was

16

sufficiently younger than the plaintiff to create an inference of age discrimination.[8] *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (citing *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988)).

The defendant argues that with respect to Ms. Brewer, the plaintiff does not meet the fourth prong of her prima facie case because Ms. Brewer was never promoted to the director position. It is undisputed that during the spring of 1998, Mr. Hackney decided to require that the director be at least an LPN.[6] It is further undisputed that Ms. McDaniel left the position in April of 1998, and that Mr. Hackney interviewed Ms. Irvin that very month. However, Ms. Irvin did not begin work until June of 1998, and thus, in the interim, Mr. Hackney transferred Ms. Brewer, a part-time employee and college student, to the social services department from the business office to perform charting and filing duties. It is clear that Ms. Brewer was in the department only temporarily for a matter of weeks and that her

---

[5] The Supreme Court in *O'Connor v. Consolidated Coin Caterers Corp.*, 116 S. Ct. 1307, 1310 (1996), modified the fourth element in ADEA cases so as to include replacement by persons also within the protected class.

[6] The plaintiff attacks Mr. Hackney's reasons for wanting an LPN or RN for the director position on the basis that it was a pretext for discriminating against the plaintiff. However, the court will not second guess the business judgment of the defendant. Moreover, the court rejects the plaintiff's contention that the nursing degree requirement was a pretext evidenced by the fact that Angela Allums, the administrator for DHS, hired a person with a social services degree but not a nursing degree for the position. First, the court notes that the plaintiff did not have either degree. Second, the court notes that Ms. Allums testified that in the four facilities in which she worked before moving to DHS, the social services director had a bachelor of science degree in social services, but did not have a nursing degree. She also testified that with the change in Medicare reimbursement "many facilities got into using a clinician, depending on their size, their volume of Medicare, in looking at residents or potential residents for the facility, because they could function in a dual role as a social services director, as well as doing an on-site and evaluating the clinical aspects." Health Care's evidence (Doc. No. 77) Allums' deposition at 14-18. She further testified that the clinician in those circumstances would have either an RN or LPN degree. *Id.* It is undisputed that there are no uniform standards or requirements for the qualifications that a social services director in a nursing home must possess, and that some administrators and facilities may find it more beneficial to have the director hold a nursing or clinical degree. For these same reasons, the court rejects the plaintiff's argument that she must have been qualified for the director position at Health Care simply because she currently serves as the social services director at Altoona Health Care Center.

duties were more limited than were those of the director. Mr. Hackney testified that he knew Ms. Brewer would be leaving in the fall when she went back to college. Plaintiff's evidence (Doc. No. 91) tab 7 at 120-21.

Such evidence strongly suggests that Ms. Brewer's transfer was only a temporary measure and not a permanent job promotion. Even more significant is the fact that Ms. Brewer did not receive a raise upon transferring to the social services department. Based on such evidence, the court finds that the plaintiff cannot establish a prima facie case of ADEA discrimination with respect to Ms. Brewer because Ms. Brewer was never promoted to the position of director.

The defendants also argue that the plaintiff cannot establish a prima facie case with respect to the promotion of Ms. Long in August of 1998, and the promotion of Ms. Hampton in September of 1998, because the plaintiff was not qualified for the position. It is undisputed that after Ms. Irvin left the director position, Mr. Hackney renewed his search for an LPN or RN to fill the position. The plaintiff even testified that "Mr. Hackney told me that he had decided to start trying nurses in that position because the others he had put in it didn't seem to be working out. Jane [Irvin] was the first nurse he put in that position." Health Care's evidence (Doc. No. 79) Amos deposition at 58-59. In addition, along with the plaintiff, there was another applicant, Byron Tidwell, who applied for the position and did not get it. Mr. Tidwell was younger than 40 and was also a CNA like Ms. Amos. Ms. Long, on the other hand, had experience at Health Care as a CNA, and had also obtained her LPN license.

18

As for Ms. Hampton, it is undisputed that she is an LPN and had better qualifications than did the plaintiff. Mr. Hackney hired her almost immediately after Ms. Long left the position, and she remained in the job for the remaining time that Health Care operated the facility. The plaintiff was again made aware of the qualifications sought by Mr. Hackney during another conversation on September 18, 1998, in which Mr. Hackney explained why the last three people he had selected for the position were LPN's.[7]

The court finds that both Ms. Long and Ms. Hampton were more qualified for the position since they both had their LPN certifications. Therefore, the court concludes that the plaintiff cannot make out her *prima facie* case. Accordingly, summary judgment will be granted as to plaintiff's ADEA promotion claims.

## C. Retaliation.

In order to make out a prima facie case of retaliation under Title VII, the plaintiff must show (1) that she was engaged in statutorily protected expression; (2) that the defendant took an adverse employment action against her; and (3) a causal link between the protected expression and the adverse action. *Raney vs. Vinson Guard Service, Inc.,* 120

---

[7]The court also notes that Mr. Hackney "told me that he had had several people in the position, that he thought he was going to try an LPN at this time . . . ." Health Care's evidence (Doc. No. 79) Amos deposition at 101. Sherry Fambrough, director of nursing, also stated that in the spring of 1998, Mr. Hackney

> indicated to me that he was considering a nurse (a Registered Nurse or a Licensed Practical Nurse) because he believed that a nurse would be best qualified to evaluate the medical condition of potential residents of the facility. It is my understanding that this was important, at least in part, because of Medicare's institution of the PPS System. Although I do not know all of the technical details of the PPS System, it is my understanding that it makes it more important for long term care facilities to carefully assess the medical condition of potential residents who are Medicare participants prior to their admission to the facility because of its reimbursement provisions.

Health Care's evidence (Doc. No. 76) tab 3, ¶ 3.

F.3d 1192, 1196 (11th Cir. 1997).[8] The defendant asserts that the plaintiff cannot show any

adverse employment action against her because her allegations amount to no more than

minor irritations and inconveniences which are not actionable. The plaintiff herself quotes

the holding in *Perryman v. West*, 949 F. Supp. 815, 819 (M.D. Ala. 1996), in recognizing that

"an employment action must affect a term or condition of employment and is not adverse

merely because the employee dislikes it or disagrees with it." Plaintiff's responsive

submission (Doc. No. 92) at 9-10.

The actions that the plaintiff asserts constituted retaliation include:

being denied accommodation, being paid less than other employees with
less seniority, disciplined, being criticized by her supervisor for allegedly
taking too long of breaks and not being in the hall enough, being rudely
ignored by her supervisor after she attempted to talk to her, ostracized by
fellow co-workers, not given phone messages or calls that she received,
complaints by her supervisor that she was not doing her job, scheduling her
to work on a weekend she had previously advised that she could not work
and forcing Amos to transfer out of the department earlier than requested
which led to Amos' resignation.

*Id.* at 9.

The plaintiff asserts in her brief that she was "ostracized by her co-workers. Even her

sister-in-law turned against her and would stop talking or shut the door if Amos was nearby.

The co-workers would look to see who could hear their conversation prior to speaking to

her," and she did not receive two phone messages from Ms. McDaniel. *Id.* at 11. The

plaintiff also complains that she once went to talk to Ms. Morris about things not being done

right in her job and alleges that Ms. Morris picked up a paper and began reading aloud and

---

[8] The court finds it unnecessary to address the defendant's argument that claims based on conduct which
occurred prior to February 13, 1999, are time-barred as the plaintiff is unable to assert a prima facie case as to any
of her claims.

would not respond to the plaintiff. The plaintiff apparently started crying and left Ms. Morris' office. As to the phone messages, the plaintiff testified that it depended on the person who took the call and their mood as to whether messages were posted or delivered to the person involved. There is no evidence that the plaintiff ever complained about these two instances or other alleged behavior by plaintiff's co-workers. As to Ms. Morris' behavior on one occasion, although the plaintiff may have felt that Ms. Morris rudely ignored her, she fails to show how this single incident constitutes an adverse employment action. The plaintiff cites to no law that requires supervisors or co-workers to be polite or friendly. The anti-discrimination laws were not created to impose a code of civility in the workplace.[9] Accordingly, summary judgment shall be granted on these claims.

The plaintiff also complains that although she was accommodated with a modified work schedule after her surgery when Ms. Fambrough was the director of nursing, she was refused an accommodation in February of 1999, by Ms. Morris, the new director of nursing, when she requested a modified work schedule after returning from leave due to hypothyroidism and hypertension. However, it is undisputed that Ms. Morris would not allow her to work 10-hour days because the restorative department was one person short and did not have anyone to cover the other two hours of the regular 12-hour shift. Furthermore, it is undisputed that Ms. Allums told the plaintiff that Ms. Fambrough should not have allowed the earlier modification without discussing it with her first. Regardless, Ms.

---

[9] The court does not suggest that a claim involving an employer who orchestrated or approved a campaign of ostracism or mistreatment on a personal level following the exercise of a statutorily protected right would not be actionable. There is here no evidence to suggest such employer involvement, however. Moreover, there is no evidence to suggest a connection between the plaintiff's EEOC charge against Health Care and her claimed mistreatment by DHS.

21

Allums offered to allow the plaintiff to transfer from the restorative department to another hall where she could work an 8-hour shift, but the plaintiff decided to continue to work in the restorative department and did not request to be transferred until August 23, 1999, more than 6 months later. Although Judy Able worked a modified work schedule due to a worker's compensation injury she had received prior to becoming a restorative CNA, she began this modified schedule before Ms. Morris became the director of nursing and before DHS became the manager of the facility. DHS simply made no changes to Ms. Able's schedule when the change in management occurred. Accordingly, the court finds the plaintiff's claim to be without merit.

The plaintiff also argues that she was the lowest paid employee in the department, even though she had more seniority. First, it is undisputed that Janet Duke, another restorative CNA, made less per hour than did the plaintiff while employed by DHS and resigned in January of 1999. Second, and more importantly, it is undisputed that Ms. Morris never responded to the plaintiff's complaint regarding pay because the evaluations and raises the plaintiff alleges others had received had taken place prior to DHS taking over. The individuals who had performed those evaluations and had given those raises were not employees of DHS. Moreover, the evidence is that Ms. Morris had simply accepted the evaluation and pay rates from Health Care, having at that time done no evaluations and given no raises since becoming the director of nursing. Accordingly, the plaintiff has put forth no evidence that the defendant DHS retaliated against her with regard to pay raises and evaluations.

Finally, the defendant correctly asserts that the plaintiff's complaints of Ms. Morris and/or Ms. Allums closely monitoring her and making comments or informally reprimanding her (and another co-worker) for being in the office rather than on the hall and taking too many or too long breaks do not constitute adverse employment actions. Furthermore, although the plaintiff complains about being scheduled to work a weekend she had previously advised she could not work, it is undisputed that the plaintiff did not work that weekend and was not disciplined. Lastly, the plaintiff also asserts that she was transferred from the restorative department a few weeks earlier than she had requested and that this action led to her resignation. However, it is undisputed that the plaintiff had already decided to resign before she learned about the transfer.[10] Therefore, the court finds no adverse employment action with regard to this claim as well.

## V.     Conclusion.

Accordingly, based on the evidence recited above, it is clear that the plaintiff's claims of age discrimination and retaliation are due to be dismissed on summary judgment. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this **26th** of July, 2000.

Edwin Nelson
United States District Judge

---

[10] Interestingly, the plaintiff provides no discussion of these complaints in her brief (Doc. No. 92) at pages 9-12 other than her bare assertions that these acts constituted retaliation.

23